# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01434-COA

## CONSOLIDATED WITH

## NO. 2017-CT-01231-COA

JOHN FREDERICK VANAMAN, JR.                  **APPELLANT**

v.

AMERICAN PRIDE PROPERTIES, LLC                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/03/2024 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | MICHAEL B. HOLLEMAN |
| ATTORNEY FOR APPELLEE: | LEWIE G. "SKIP" NEGROTTO IV |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 04/28/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. In 2018, this Court found that John Vanaman Jr. did not receive proper statutory notice of a tax sale of his commercial property, and we reversed and remanded the matter to the Harrison County Chancery Court to determine the amount Vanaman owed to American Pride, the tax purchaser, in order to redeem his property. *Vanaman v. Am. Pride Props. LLC* (*Vanaman I*), 287 So. 3d 251, 258 (¶24) (Miss. Ct. App. 2018). On remand, Vanaman asserted claims for restitution related to American Pride's possession of the property. Specifically, Vanaman claimed that the property was damaged and that equipment was

removed by American Pride or its agents. Vanaman also asserted that he was entitled to collect the fair rental value of the property for the time he was dispossessed due to the void tax sale.

¶2. The chancellor held a hearing to determine the redemption amount owed to American Pride and to determine whether Vanaman was entitled to damages. Following a hearing and post-hearing briefing by the parties, the chancellor determined that Vanaman owed $25,299.51 to redeem the property and that American Pride did not owe Vanaman restitution. Vanaman appealed. After review, we affirm the chancellor's decision.

## FACTS AND PROCEDURAL HISTORY

*The Tax Sale and First Appeal*[1]

¶3. Vanaman testified that in 1982, he and his mother purchased property upon which they operated a gas station and grocery store. In 2001, Vanaman's mother quitclaimed her interest in the property to Vanaman. The property was sold three times: in 2009 for 2008 taxes, in 2010 for 2009 taxes, and in 2013 for 2012 taxes. Vanaman redeemed his property from the 2009 and 2010 tax sales but not the 2013 tax sale. American Pride[2] bought the property in August 2013, when it was sold for nonpayment of the 2012 taxes.

---

[1] Facts from this subsection are taken from this Court's opinion in *Vanaman I*. Before assignment, our Supreme Court consolidated the previous appeal with the one here for record purposes only.

[2] TLHMS, LLC/RAI, a partner of American Pride, actually purchased the property, and quitclaimed its stake in the property to American Pride once the chancery clerk gave it the deed to the property. For simplicity's sake, we will refer to the tax-purchasing entity as American Pride.

¶4.     The notices of forfeiture were not sent to Vanaman's proper address, and a Harrison County deputy sheriff was unable to personally serve him. In October 2015, the chancery clerk conveyed the property to American Pride.

¶5.     In January 2016, American Pride filed a complaint to quiet and confirm tax title, and in April 2016, the chancery clerk made an entry of default with respect to American Pride's suit. The court entered default judgment in American Pride's favor. Vanaman filed a motion to set aside the entry of default and default judgment in November 2016. The chancellor denied the motion, and Vanaman appealed.

¶6.     After review, this Court found that Vanaman did not receive proper statutory notice of the tax sale of his property and held that the sale was void. We remanded "for the limited purpose of determining, in accordance with the appropriate statutes, the amount owed by Vanaman to redeem his property. Once that amount has been determined and paid by Vanaman, the chancery court shall enter an order voiding the tax deed to American Pride." *Vanaman I*, 287 So. 3d at 258 (¶24).

*Proceedings on Remand*

¶7.     After the mandate issued and the matter was remanded to the chancery court, Vanaman filed a complaint seeking "restitution, set-off, and/or recoupment for damage" to his property while it was in American Pride's possession. Vanaman moved to consolidate that issue with the action on remand, which was granted and set for hearing.

¶8.     At the hearing, Vanaman presented an expert in property appraisal who testified that

the monthly rental value of the convenience store was $6,924.05.

¶9.     Vanaman testified that there had been a convenience store on the property since 2009, though he and his mother had owned the real property since 1982. Vanaman testified that in 2016, at the time American Pride acquired a deed to the property, there was a "nice grocery store, convenience store, and we had a kitchen up in there." The building also had a game room. There were gas pumps on the property, but they did not have gasoline in them.

¶10.    Vanaman testified extensively about the state of the property when he gave the keys to American Pride. He identified pictures of the property taken on April 6 or 7, 2016, and testified that they depicted the state of the building when he handed over the keys. Vanaman testified that he had built a 60-foot wall in the store as a "major structural improvement" and that there were large metal sheets protecting the wall. Vanaman testified that when he took possession again in 2021, the wall and metal sheeting had been removed. An expert in construction testified that he had prepared an estimate for Vanaman to repair all damage to the property, which totaled $95,382.40.

¶11.    Vanaman also testified that there were tables and equipment in the store that were missing in 2021, when he took possession again. He provided an exhibit listing all items he believed were missing from the property, including multiple freezers and coolers, food storage and prep areas, art, and various equipment. Vanaman testified that the total replacement cost of all the items was $151,560.38.

¶12.    Photographs taken by American Pride in August 2016 showed the alleged damage to

the property, which Vanaman detailed in his testimony.

¶13.     Vanaman testified that in November 2017, he noticed some people on the property, and he stopped to see what was going on. Vanaman claimed that a man told him they were preparing the building to be sold, and Vanaman could hear workers inside the store, taking things down and apart. Other than that, Vanaman testified that he had not seen anyone else in the store. He did not think that it would have been possible to remove all metal, wiring, equipment, and construction debris in one day, and he never saw any trucks capable of hauling it away. Vanaman's construction expert also testified that it would take at least a week to remove all the things he had priced for replacement and that it would require many trips and trucks to haul away the mess. Vanaman's daughter, Deena Nolan, lived near the property and never noticed anyone on the property.

¶14.     Vanaman also testified that the air conditioning units had been damaged and would need to be replaced. He admitted that law enforcement had arrested someone for damaging and stealing from the units, so he could not say that American Pride caused that damage. He admitted that he had no evidence American Pride had damaged any of the property, only that it had occurred while in their possession.

¶15.     Tiffany Cone, American Pride's representative, testified that American Pride was not responsible for damaging the building or modifying the interior. She explained that it would not have served American Pride's purpose of either selling the property or leasing it to generate income. Cone said that "trash[ing]" the property reduces its value. Cone testified

that American Pride did have workers visit the property to determine whether the gas pumps and tanks were operational, should they decide to lease or sell the property, but Cone denied that any damage was done to the property.

¶16.    Cone also questioned why Vanaman would have made significant improvements to the property after August 2016, when Vanaman knew at that point that American Pride had title to the property. Cone took photos in August 2016, which showed that Vanaman had not yet begun constructing the 60-foot wall with metal sheeting. Vanaman's photos from April 2017 showed the wall as constructed by Vanaman.

¶17.    Vanaman testified that he gave a key to American Pride's counsel on April 13, 2016, about a week after he had taken the photographs that were admitted as exhibits at the hearing. He testified that he did not have any additional keys and that his daughter did not have a key. Deena also testified that she never had a key to the property. However, Vanaman also testified that there were different keys to different doors: a front door key and two back door keys. He claimed that he had never gotten the keys to the back doors back from American Pride. On cross-examination, Vanaman read from his earlier deposition, in which he admitted that he was not sure if his daughter or other workers ever had additional keys to the building that he did not know about. He admitted at trial that he had turned over "one [key] for sure" and that he could not say if he had turned over the other two keys to American Pride.

¶18.    On direct, Vanaman testified that he received a fax from American Pride in September 2015 offering him the opportunity to repurchase the property for $15,000. The offer expired

6

thirty days from the date of the letter. Vanaman admitted that he had not accepted American Pride's $15,000 offer in September 2015 within thirty days. Vanaman then claimed that he met with American Pride's representative Kelly Walsh at his store in May 2016 and that he tried to give her a check for $15,000 that day to repurchase the store. Vanaman claimed that Walsh did not accept the check and told him they would send paperwork to him to complete a purchase.

¶19.    Vanaman testified that he sent via FedEx a different $15,000 check to American Pride in October 2016 based on information he received from American Pride, but his testimony was unclear about who had made the offer. He never heard from American Pride about that check, and the check was never cashed. He denied receiving a letter from American Pride, which American Pride offered for identification only, in which American Pride returned the October 2016 check because there was no agreement or settlement in place.

¶20.    However, on cross-examination, Vanaman claimed that he had met with Walsh at his store in May 2015, not 2016, as he initially testified. He denied that he had met with Cone, who was present at trial, in August 2015. Even after refreshing his memory with a letter from American Pride that he received in September 2015, which mentioned that he had met with Cone, Vanaman continued to deny any memory of that meeting.

¶21.    Cone testified that it would have been impossible for Kelly Walsh to be in Mississippi in May 2016 because she was with Cone in another state. Cone also testified that as Cone's supervisor, she would have had to approve any travel to Mississippi by Walsh, and she had

not done so.

¶22.    Cone testified that she traveled to Mississippi in August 2015 and met with Vanaman to explain the tax sale and the process moving forward. She testified that she told him not to worry because American Pride would work with him for a settlement. Cone testified that Walsh prepared a letter to present a settlement offer of $15,000 with a thirty-day expiration, which referenced Cone's visit with Vanaman. This testimony was supported by an exhibit that showed the letter and offer, which Vanaman acknowledged at trial. Cone testified that American Pride did not receive a check within thirty days of the offer.

*Chancellor's Order*

¶23.    After the hearing, the chancellor determined that Vanaman owed $25,299.51 to American Pride to redeem his property: $2,735.90 for the original tax lien, plus 1.5% interest for 133 months ($5,460.86), plus taxes for 2013 through 2017 ($16,965.95), plus $136.80 for the deed fee.[3] The chancellor noted that the parties agreed to that amount for the most part, though American Pride argued it was entitled to 1.5% interest on the deed fee, which the chancellor rejected.

¶24.    As to Vanaman's claims for the damage to the building and restitution for loss of the property during his dispossession, the chancellor rejected all requested relief. The chancellor found it was "undisputed" that there were modifications to the property between Vanaman's

---

[3] These numbers are taken from the parties' briefs to the chancery court, who accepted the calculations in awarding $25,299.51 to American Pride.

April 6 photos and American Pride's August 28 photos. The chancellor noted that a week had passed between Vanaman's taking the photos and relinquishing the keys to American Pride, finding "there was no proof eliminating the possibility that the alterations could have been made in the week between."

¶25.    The chancellor also found no evidence to support Vanaman's conclusion that American Pride allowed or knew about the removal of the 60-foot wall and sheet metal from inside the building, or the removal of any other property. The chancellor noted that neither Vanaman nor his daughter Deena ever saw anyone at the building and that Cone testified it "would not have served the interests of American Pride" to have damaged the building. Given the "essentially competing testimony" between Cone and Vanaman, the chancellor noted that it was "reduced to a he said/she said argument," and the chancellor found Vanaman's testimony to be contradictory and based on speculation. The chancellor concluded that Vanaman "lacked credibility."

¶26.    The chancellor found that he could not say the building was under American Pride's "exclusive control," pointing to Vanaman's unclear testimony about how many keys existed, who had them, and whether they had all been turned over to American Pride.

¶27.    Finally, the chancellor held that Vanaman was required to produce evidence that American Pride was unjustly enriched in order to succeed on his claim for restitution. The chancellor noted that there was no evidence American Pride had used the building or rented it for profit, so there was "no gain for the Court to disgorge." The chancellor also found that

due to Vanaman's unreliable and speculative testimony, it would be inequitable to award him fair rental value of the property during the time of dispossession.

¶28. Vanaman appealed.

**ANALYSIS**

¶29. On appeal, Vanaman raises three issues. First, he argues that the chancellor erred in calculating the amount owed to American Pride under Mississippi Code Annotated section 27-45-27,[4] claiming that interest stopped accruing in October 2016 when he tried to accept American Pride's offer of redemption. Second, Vanaman argues that he is entitled to the fair rental value of the property during the time he was dispossessed of the property. Third, Vanaman argues that the chancellor erred by not awarding restitution for damage allegedly done to the property while in American Pride's possession.

¶30. As to an ultimate determination on the merits, this Court will not reverse a chancery court's findings unless the chancellor was manifestly wrong, clearly erroneous or applied an erroneous legal standard. Further, where there is substantial evidence to support the chancellor's findings, this Court is without the authority to disturb his conclusions, although this Court might have found otherwise as an original matter. For questions of law, we employ a de novo standard of review and will only reverse for an erroneous interpretation or application of the law.

*Thoden v. Hallford*, 391 So. 3d 1137, 1144 (¶¶20-21) (Miss. 2024) (citations and quotation marks omitted).

    **I.**     **What does Vanaman owe to American Pride to redeem the**

---

[4] This section was amended in 2019 to add subsection (2), which did not affect calculations under subsection (1). Miss. Code Ann. § 27-45-27 (Rev. 2024).

**property?**

¶31.   Vanaman argues that the chancellor misapplied Mississippi Code Annotated section 27-45-27(1), which provides the amount of interest to be paid on a tax lien following the purchase of property from a tax sale. As part of this argument, Vanaman raises two sub-arguments. First, he claims that he tendered money to American Pride to redeem his title and that this tender stopped the accrual of interest. Second, he argues that the amount owed should have been set off by the restitution due to him (addressed *infra*).

¶32.   The chancellor found that "the parties essentially agree on the amount owed on the tax redemption" and found that Vanaman owed $25,299.51 to American Pride. The chancellor found that American Pride was not entitled to interest on the deed fee that had been paid during the tax sale proceedings. The parties do not disagree on the amount owed for American Pride's tax payments, the deed fee, or the calculation of interest.

¶33.   However, Vanaman argues that the accrual of interest on the tax payments should have stopped in 2016 when he allegedly tendered a $15,000 redemption payment to American Pride. He claims that this "tender" "operated to terminate the accrual of interest and penalties" after the offer was made. Vanaman points to *Maris v. Lindsey*, 134 Miss. 339, 99 So. 130 (1924), for support, but *Maris* actually defeats his argument. In *Maris*, a chancellor found that Maris was not entitled to accrue interest beyond a specific date on a lien against Lindsey because Lindsey had "made a valid and legal tender" to Maris on that date. *Id.* at 130-31. But the Supreme Court reversed the chancellor, finding that Lindsey's

offer was not a valid and legal tender. *Id.* at 131. The Supreme Court held that the tender was not "valid and legal" because "a valid tender . . . must be paid into court . . . or be of a definite sum," and because Lindsay did not offer a definite sum and did not pay the amount into court, it was "no more than a conditional offer of an indefinite amount." *Id.* The Court also noted that the tender must be "of the amount due." *Id.*

¶34. Vanaman testified that he made an offer of $15,000 to American Pride in October 2016. While this is a definite amount, American Pride denied that $15,000 would have satisfied its interest in the property at that time. Additionally, Vanaman's offer was not paid to the court; it was sent by FedEx to Florida and later rejected and returned. Vanaman's argument that his offer of $15,000 stopped the accrual of interest is without merit because there is no evidence of a valid and legal tender, as required under *Maris*.

¶35. We affirm the chancellor's determination that Vanaman must pay $25,299.51 to American Pride to redeem his property. Vanaman's contention that his alleged offer to American Pride should have stopped the accrual of interest is without merit. Finally, although Vanaman argues that the chancellor should have already set aside the tax deed, this Court's order on remand was for the chancellor to determine "the amount owed by Vanaman to redeem his property," and only after that amount "has been determined and paid by Vanaman[] [shall] the chancery court . . . enter an order voiding the tax deed to American Pride." *Vanaman I*, 287 So. 3d at 258 (¶24). This entire proceeding on remand was to determine the amount Vanaman owes, which has been affirmed here. Once Vanaman pays

12

the required amount, then the chancellor can void the tax deed.

## II. Was Vanaman entitled to restitution for the fair rental value of his property during the time when American Pride was the possessor?

¶36. Vanaman argues that he is entitled to restitution for the fair rental value of the property during the time he was dispossessed of the property. The chancellor found that Vanaman had not shown any unjust enrichment by American Pride and concluded that restitution could not be awarded without unjust enrichment.

¶37. Vanaman argues that the common law right of mesne profits entitles him to recover the fair rent value of his property during a period of dispossession, which he claims is codified in Mississippi Code Annotated section 27-45-27. We find no application of mesne profits to a tax sale case, nor has section 27-45-27 been interpreted in the manner argued by Vanaman. Most, if not all, cases using that term refer to a profit due to some improvement to the land. There is no question that American Pride did not improve the property. All cases Vanaman cites in which courts have applied strict liability to the possession of property to award mesne profits have been from other states. However, some Mississippi cases offer guidance.

¶38. Although our Supreme Court did not use the term "mesne profits," in *Hicks v. Blakeman*, 74 Miss. 459, 21 So. 400 (1897), the Court stated, "The full rule is allowance to defendants for improvements to the extent of the enhanced vendible value of the lands imparted by such improvements, and liability for enhanced rental value imparted by the same improvements." *Id.* at 399. In *Hicks*, the idea of mesne profits or fair rental value during

13

dispossession was tied to improvements made to the property. *Id.*

¶39. Vanaman points to *Brown v. Womack*, 181 Miss. 66, 178 So. 785 (1938), in which the Supreme Court upheld an award of rent to the owner of land sold at a later-invalidated tax sale for the period she was dispossessed of the property. In *Brown*, the rent amount was determined based on the rent collected by the tax purchaser, suggesting that the Court did not want the tax purchaser to profit from what was a void and illegal purchase. *Id.* at 787. Indeed, in that case, the Supreme Court found that the tax purchaser was a "mala fide possessor"—he had continued with improvements to the property after the owner told him that he had no legal right to the property. *Id.*

¶40. In *Johnson v. Carter*, 193 Miss. 781, 11 So. 2d 196 (1943), the Supreme Court remanded a tax sale dispute to the chancery court to determine the amount of "reasonable rental" owed by the tax purchaser to the landowner. *Id.* at 198. In that case, like *Brown*, the purchaser engaged in "improvements and other expenses" that the court deemed "mala fides[,] which precludes reimbursement." *Id.* The Court ordered reasonable rent to be determined without credit for the improvements made on the property. *Id.*

¶41. Beyond his reliance on *Brown*, Vanaman points to no other case that required a tax sales purchaser to pay the owner fair rental value for the period the owner was dispossessed of the property. American Pride argues that the rent award in *Brown* was more about disgorging the purchaser of profits he made during his possession of the property and not paying the owner for the time she was dispossessed. The chancellor appeared to agree with

14

this interpretation, finding that there was no evidence American Pride had been unjustly enriched by its possession of the property and therefore no profit to disgorge.

¶42.    After a close reading of our caselaw, we conclude that the law of this state requires that the tax purchaser incur some benefit as a result of possession of the land—collecting rent, making improvements, harvesting timber, and possibly some bad act on behalf of the tax purchaser—in order to entitle the owner to receive fair rental value for the period of dispossession. Here, there is no evidence of a benefit to American Pride or bad acts by American Pride. As such, American Pride owes no restitution to Vanaman for the time it possessed his property.

### III.    Was Vanaman owed restitution for the changes to his property?

¶43.    Vanaman argues that he presented "uncontroverted proof" of nearly $250,000 in damage to his property, which he says occurred while American Pride had exclusive control of the property. However, as noted, the chancellor found Vanaman's testimony to lack credibility. Specifically, the chancellor found that Vanaman admitted that a week passed between the time he took photos of the property—when it was in good condition—and when he turned the keys over to American Pride. The chancellor noted that "there was no proof eliminating the possibility that the alterations could have been made in the week between Vanaman's photos and the relinquishment of the keys."

¶44.    Additionally, the chancellor found that the testimony and evidence did not support Vanaman's argument that American Pride had begun a remodeling project on the property

15

and removed interior walls and sheet-metal coverings, part of Vanaman's claims. The chancellor noted that neither Vanaman nor his daughter testified they ever saw someone on the property who would have undertaken the work. The chancellor also noted that the conclusion that the modifications had been made with American Pride's permission would require speculation, as there was no evidence that American Pride or its representatives conducted or approved of such work. American Pride's representative, Cone, testified that American Pride was not responsible for the modification because it would not have benefitted them to damage the property.

¶45. The chancellor noted that much of the evidence on this point was a he said/she said between Vanaman's claims and Cone's denials, and the chancellor found that Vanaman's testimony was "contradictory" and that "he lacked credibility."

¶46. After review, we cannot say that the chancellor's findings on this point are clearly erroneous. There is substantial evidence to support the chancellor's determination, and we will not second-guess his findings as to the parties' credibility. Therefore, the chancellor's denial of damages to Vanaman is affirmed.

## CONCLUSION

¶47. We affirm the chancellor's factual findings that Vanaman did not prove he was entitled to damages for modifications done to his store or that he was entitled to restitution for the fair rental value. We also affirm the chancellor's determination that Vanaman owes American Pride $25,299.51 to redeem the property.

16

¶48.  **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**